LEIGH M. CLARK, Retired Circuit Judge.
This is a consolidated appeal of six cases that were consolidated for trial at the request of the defendant. All bear a partial designation of CC-80, signifying that they were filed in the circuit court in 1980; they are individually and differentially designated as 252, 253, 254, 255, 256, and 258.
The indictment in each case charges defendant with receiving, retaining, or disposing of stolen property, knowing that it was stolen or having reasonable grounds to believe it had been stolen and not having intent to restore it to its owner, “in violation of Section 13A-8-18 of the Code of Alabama.”
There was undisputed testimony by the owner, or an agent of the owner of the property described in each indictment, that said property had been stolen. As to the property described in some of the indictments, the testimony was that the property was stolen in the latter part of 1979, as to the property described in other indictments, the evidence was that it had been stolen in 1980. Although no question is raised as to the point, it should be noted that defendant could not have been properly charged with a “violation of Section 13A-8-18, of the Code of Alabama” unless the alleged crime occurred in 1980, for the reason that Section 13A-8-18 is a section of Title 13A, which consists of the Criminal Code of the State of Alabama, enacted by Acts 1977, No. 607, but which did not ultimately become effective until 12:01 A.M. on January 1, 1980. Acts 1979, No. 79-125, p. 230. Each of the indictments was returned on March 7, 1980, and the undisputed evidence shows that appellant did not receive, retain, or dispose of any of the property described in any of the indictments prior to the effective date of the Alabama Criminal Code. Therefore, the statutory law set forth in the Alabama Criminal Code is applicable.
The situs of all the property described in the indictments in cases numbered 252, 253, 254, 255, and 256, at the time of defendant’s arrest, was in a room of a warehouse, referred to in the evidence as “Room 101” of the “Mini-Warehouse” in Calhoun County. The property described in the indictment in 80-258 was at an entirely different location at the time of defendant’s arrest. For reasons that will be obvious upon our future consideration herein of 80-258, we will limit our present consideration to questions pertinent to the other cases.
CASES CC-80, 252, 253, 254, 255 AND 256
According to testimony of witnesses for the State, law enforcement authorities had obtained information prior to February 22, 1980, concerning stolen merchandise at the “Mini-Warehouse.” About three or four o’clock on the afternoon of February 22, law enforcement personnel went to the warehouse and returned therefrom after looking over the premises about thirty minutes or an hour. Some of them accompanied by another, or other officers, went again to the warehouse between eight and nine o’clock on the night of February 22 to determine what room of the warehouse was rented by Larry McPherson.[1] In checking *1109 the register they found that Larry McPherson rented Room 101. They continued to look around the premises until about two or three that night when they returned to their base. Between nine and ten o’clock on the morning of February 23, some of them returned to the warehouse and maintained surveillance of Room 101 until about 12:30, at which time, according to the testimony of Investigator Winfrey, who accompanied the officers, the following occurred:
“A. Approximately 12:30 p.m. a pick-up truck pulled up in front of Room 101.
“Q. Did you have a description on this pick-up truck as to whose it was and that type thing?
“A. Yes, sir.
“Q. Whose was that?
“A. Larry McPherson’s
“Q. What occurred after you saw the blue pick-up truck pull up?
“A. I noticed the front of the pick-up truck at the warehouse.
“Q. What room was it at now?
“A. At 101.
“Q. Okay, go ahead.
“A. I pulled my car up in front of the pick-up truck. I had called Reese and Alexander on the radio and I got out of my car and I saw a subject behind the pick-up truck.

“Q. All right, who was that?
“A. Mr. Sims.
“Q. What was Mr. Sims doing?
“A. He was standing at the rear of the pick-up truck with a paper sack or grocery bag in his arms.
“Q. At this time, was the door open or closed?
“A. It was open.
“Q. To 101?
“A. Yes, sir.
“Q. Could you see inside the building from where you were?
“A. I could see partially inside the building, yes, sir.
“Q. Did you have a description of any of this stolen merchandise that you were looking for?
“A. Yes, sir.

“Q. And you saw those from your same position there, at that time, from outside? “A. Yes, sir.
“Q. What did you do at that time?
“A. I advised Mr. Sims to come around to where I was at and identify himself and he came around the truck.
“Q. Did you see anybody else out there at that time?
“A. Not at that time, no, sir.
“Q. Any time out there that time?
“A. Yes, sir.
“Q. Who was that?
“A. Larry McPherson.
“Q. When did you see Mr. McPherson?
“A. I had placed Mr. Sims up against the building and was there with him, and McPherson came out of the warehouse.
“Q. What did you do — Let me just ask you this. Did Deputy Reese have occasion to come back down there to that area?
“A. Yes, sir. In a few minutes he arrived back there.
“Q. What, if anything, did you do regarding these two subjects that were out there?
“A. I think Deputy Reese searched them and we placed them in the back of my car.
“Q. And then you placed them under arrest; is that correct?
“A. Yes, sir.”
The witness further testified that they thereafter obtained a search warrant, that pursuant to the search warrant they searched Room 101 and there they found the property described in the indictments in cases 252, 253, 254, 255, and 256.
One of appellant’s three assertions of prejudicial error is that “the trial Court *1110 erred in refusing to grant Appellant’s motion to exclude the evidence for that the State had failed to make a prima facie case.” The motion to exclude was made when the State rested its case. After the motion was overruled, Larry McPherson and appellant testified extensively; Larry McPherson testified positively that he alone, in particular exclusion of appellant, was guilty of receiving, etc., the stolen property knowing that it had been stolen. Sims denied positively any knowledge of the fact that the property had been stolen. He said that he had borrowed the truck of McPherson to take some personal belongings to the warehouse and store them in Room 101 with the permission of McPherson. He had been there only one time before February 23, about a week or two before he was arrested, at which time he also used Room 101 to store some of his personal possessions, which storage was necessitated by reason of a recent fire at his home. He denied any transaction whatever with the person who Larry McPherson testified had stolen the property, but he admitted knowing him.
There is no insistence by appellant that the evidence was not sufficient to present a jury issue as to defendant’s guilt. There was no request for an affirmative charge in favor of defendant, no motion for a directed verdict or the like.
We think that at the time the State rested there was sufficient evidence to present a prima facie case against defendant. In addition to the evidence already summarized, there was testimony that a padlock was on the ground near the door of Room 101 and that the padlock could be unlocked by a key that was on the key ring of appellant, as well as by a key on the key ring of Larry McPherson, at the time of their arrest.
The overruling of a motion by defendant to exclude the evidence of the lock and the key on appellant’s key ring is made the basis of another insistence on error by appellant. Defendant’s counsel said at the time the lock was offered in evidence, that defendant had no objection. At each time, it appears that a witness had said that the lock “came off of number 101 at the Mini-Warehouse,” but upon being further questioned, the witness said that it was not “hanging in the hasp” but he believed it was on the ground at the time.
We agree with appellant’s contention that if the lock had been in place in the staple or like of the locking device it would have constituted stronger evidence against the defendant than it did in the circumstance of its lying on the ground, but we do not agree with the contention that the evidence showed no more than a “possibility” that the particular lock “could be used to lock the warehouse.” Its proximity to the door, while defendant and McPherson were there, its obvious usability to lock the door, and the presence on the person of both appellant and McPherson of a key that would unlock the particular padlock furnished a basis for a reasonable inference that defendant was not a stranger to the general use of Room 101 as a room for storing stolen property. The court was not in error in overruling defendant’s motion to exclude the particular evidence or in overruling defendant’s motion to exclude the State’s evidence when it rested in captioned cases.
CASE CC-80, 258
At the time of appellant’s apprehension and arrest, the stolen property in this case was located in a small house, referred to vaguely in the evidence as a garage, in the curtilage of a dwelling that had been rented to defendant-appellant, but which had never been used by him as a residence. According to his testimony and the testimony of the rental agent of the owner of the premises, they had not been rented as a place to live but as a place for a storage of some insulation material to be used in connection with a construction or commercial venture in which defendant was purportedly engaged. On or about February 26, or 27, 1980, the law enforcement officers went to the house and asked the rental agent for *1111 permission to search the premises. The rental agent gave them permission. They searched the house and garage without a search warrant and seized a major part, if not all, of the property described in the indictment in case numbered 258.
Evidence as to the fruits of the search of the house and “garage” was admitted over repeated objections by counsel for defendant. The trial judge made known his reasons for overruling his repeated objections and motion to exclude the evidence as to the fruits of such search stating:
“The objection seems to be to the search of the house and the garage that’s been talked about. The Court’s ruling on the testimony to this point, that there has been an abandonment of the premises by the Defendant. The one who then had control of the premises was Mr. Dishman and as such, it would be Mr. Dishman who had the control of the premises, and granting permission to anyone to come on the premises and allowing them to search or not. From all of the testimony that is before the Court at this point, that the defendant had abandoned that particular property in question by his failure to make payments thereon which came due at the first of the preceding month, and by his other actions and statements which also indicated the fact that he was not leasing those premises any further and therefore has no standard objection to any search thereof.”
Defendant’s motion to exclude the evidence as being insufficient “to make a pri-ma facie case” against him presents additional and distinct problems from those presented in the other cases. We do not find, and we are unable to give, a fully satisfactory answer to the following sentence in appellant’s brief:
“The State of Alabama is put in an awkward position by relying on the theory that the Defendant has no possessory interest in the dwelling and on the other hand arguing that he in fact possessed this contraband.”
The evidence shows without dispute that all of the property described in the indictment and found in the house or garage was the property of Mr. Sam Sprayberry, doing business as Sprayberry’s Clothing Planet in Anniston and that it was stolen therefrom on November 24, 1979. The evidence further shows by testimony of the rental agent that the last time he saw defendant prior to the search of the premises was on January 25, 1980. The agent further testified:
“Q. Did he come to pay the rent or something?
“A. No.
“Q. Was he in the house or in the garage?
“A. No, he didn’t go in the house that day. We started to go in the house, but he didn’t have his keys with him.
“Q. So, he just came out there to visit you, didn’t he?
“A. He came out to look around the place, not to see me.
“Q. What was the last time you saw him go into the house or the garage?
“A. I never saw him in the garage.
“Q. What about the house?
“A. Maybe six months ago.
“Q. Did you have any of your belongings stored over there?
“A. Yes, I do.
“Q. Are they still there?
“A. Yes, they are.
“Q. Were they at this time?
“A. Yes, they were.
“Q. Do you go in there from time to time to check them?
“A. Occasionally every day.
“Q. Because you’ve had trouble with break-ins?
“A. Not with me, no.
“Q. The house—
“A. Next Door, in the houses, yes.
“Q. And it’s about six months since you’ve seen Garry in the house?
“A. Yes.
“Q. Never has been in the garage?
*1112 “A. Never saw him in the garage.
“Q. That garage, isn’t it open?
“A. Wide open.
“Q. There’s not a door or anything, is there?
“A. No, sir.
“Q. It’s more of a shed, you might say?
“A. That’s right.
“Q. And I want to ask you one more— Back either time that the investigators went in either the garage or the house, are you saying at this time that it’s your opinion that Garry had given up the house?
“A. I’d say at the time they went in it, he had given up the house. Yes, I think I made that statement to them, that he said that he was going to give up the house.
“Q. But he didn’t give the key back?
“A. No.
“Q. And hadn’t removed any of the insulation stuff; was it still there?
“A. I don’t think he had any at the time.”
It was the further testimony of Mr. Dish-man that he had rented the premises to defendant and another person, not Larry McPherson, approximately fourteen months before the search, that the rent was $120.00 per month, that defendant had paid it each month for all the months except the last one, though he did not always pay on time. He said that defendant owed him twenty days rent, that he attempted to contact defendant but was not able to do so until three days before, at which time he told defendant that the house had been rented to another person and the defendant said, “Ill come over and give him the key so he can go in and clean it out.” There are many pages of additional testimony as to the legal status of defendant as to the house and garage at the time of the search, but it is not materially different from that which has been stated above. All in all, it leaves considerable doubt as to whether defendant’s interest in the premises had been so abandoned by him as to cause him to lose standing to object to the evidence of the fruits of the search.
Whatever question there may be as to the validity of the search and whatever question there may be as to the sufficiency of the evidence to show scienter and conduct of defendant as to the stolen property on the premises after 12:01 A.M. January 1, 1980, we are persuaded that an unfavorable decision to appellant of either question would result in a decision favorable to him of the other. The result and the counter-result are somewhat comparable to the see-sawiness of the evidence relative to each question. As one goes up in strength, the other goes down, and vice versa.
We appreciate the careful study by the trial judge of the two major questions in case numbered 258. Even though it can be said with reason that his ruling as to the admission of evidence of the fruits of the search was correct and with equal reason that his denial of defendant’s motion to exclude the evidence as to this particular case was correct, a conclusion that both rulings were correct is without logical support. The result is that the judgment in CC--79, 258 should be reversed. In view of all the apparent circumstances, particularly the apparent lack of sufficient evidence against defendant, separate and apart from the evidence of the fruits of the search, in any case to be tried separate and apart from the other cases, we see no occasion for another trial of this case and hereby relieve the trial judge and the prosecution from any further responsibility by hereby reversing the judgment and rendering a judgment discharging the defendant in this particular case.
At first we did not understand the action of defendant and his counsel in requesting the consolidation for trial of the six cases. Now we do. The result in this particular case accentuates the acumen of each quail in a covey that there is safety in numbers when besieged by competent adversaries *1113 with adequate arms and plenty of ammunition.
CONCLUSION
The judgments in cases other than in number 258 should be affirmed. The judgment in the case numbered 258 should be reversed and a judgment here rendered discharging the defendant in such case.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED IN FIVE OF SIX CONSOLIDATED CASES; REVERSED AND RENDERED IN ONE OF THE CASES.
All the Judges concur.

. Larry McPherson has been convicted on indictments charging the same crimes as those in most of the instant cases, and the judgments against him have been affirmed. McPherson v. State, Ala.Cr.App., 7 Div. 743, affirmed without opinion October 7, 1980.